## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**Great Plains Christian Radio, Inc.**

      **Plaintiff,**

      **v.**                               **Case No.  04-2559 JWL**

**Central Tower, Inc.**

**and**

**Ray Ryan**

      **Defendants.**

_____

## MEMORANDUM AND ORDER

This case concerns a dispute over an allegedly defective radio tower (the Tower) designed and sold in 1992 by Central Tower, Inc. (Central Tower) and its president, Ray Ryan (Mr. Ryan), to Great Plains Christian Radio, Inc. (GPCR). Against Central Tower, GPCR has claimed fraud, breach of implied warranty of fitness for a particular purpose, breach of contract, strict liability, and negligence. Against Mr. Ryan, GPCR has claimed fraud. This

matter comes before the court on Central Tower and Mr. Ryan's motion for summary judgment (doc. # 41).  For the reasons explained below, the motion is granted in part and denied in part.[1]

## STATEMENT OF MATERIAL FACTS

In August 1991, GPCR obtained its construction permit for a Christian radio station from the FCC.  In April 1992, GPCR signed a contract with Central Tower, an Indiana corporation, for the fabrication and installation of a 995' guyed tower.  Mr. Ryan, founder and head of Central Tower, engaged in price negotiations with GPCR.

Contrary to the assurances provided by Central Tower's salesperson, Central Tower hired a subcontractor to install the tower.  At that point, GPCR decided that they would not contract with Central Tower for future tower maintenance.  GPCR also was disappointed by the delays of the project and the lack of communication with Central Tower during the Tower's installation.  According to GPCR, Central Tower led GPCR to believe that the Tower would be designed by specialty engineers who would ensure all parts of the tower were custom welded.

In September 1992, the tower was completed and the radio station went on the air. At 855', the tower is reduced to a 2' face from the primary 5' face.  The tower then has a 2' face

---

[1]   The court also recognizes that Central Tower filed a motion to strike (doc. # 51). Because the court did not consider any of the objectionable evidence in arriving at its decision, nor would consideration of this evidence cause this court to change its opinion, the court does not reach the motion to strike because it is deemed moot.

from 855' to the top of the tower at 955'.   This top area is referred to as the "transition section."

In 1993, a dispute arose regarding the installation of a transmission cable of the Tower. Temporary repairs were made, and then Central Tower installed a replacement section to remedy the problem.   The two parties disagreed about who was responsible for the expense of the repair.

Mr. Hughes, head of GPCR, has testified that following this dispute GPCR "developed a distrust of Central Tower."   He also sent a memorandum to GPCR's legal counsel in 1993, which outlined many areas of concern.   He wrote in part:

> The entire problem was caused by willful neglect in doing the job right the first time.   Was Central Tower knowledgeable that the job was not done correctly and was just hoping we would not find out? What did they know and when did they know it? Since they have not operated in good faith over this matter is there reason to doubt if the correct strength steel was used for the tower legs?   Should we also be asking for funds for an engineering study to see what other problems may exist?

In 1997, GPCR hired Stephen Larson (Mr. Larson) as chief engineer.   He acted to repair equipment and hire people to maintain the Tower.   Mr. Larson hired Rhodes Tower Service (RTS) to inspect the Tower and determined what needed to be done to place another antenna on the Tower.   RTS detected cracks in the transition section's welds.[2]   When the cracks first were detected, RTS fabricated and welded braces for the transition section and welded the

---

[2] These transition cracks were in a different area of the Tower than the alleged defects in the leg to flange weld, which are also at issue in this suit.

cracks. The remedy, however, was temporary.   Shortly thereafter, the welds cracked again.   Mr. Larson contacted Mr. Ryan several times to discuss these problems.

In 2000, GPCR retained Paul J. Ford and Company to fix the problems with the Tower's transition section.   GPCR also contacted Central Tower for assistance in solving the problem. In response to GPCR's request, Mr. Ryan sent a letter in April 2000 outlining Central Tower's position.  His letter stated in part:

> [We] do not feel that these problems are a result of a faulty design.   Your tower was designed by a structural engineer in 1992, meeting ANSI222-E standards, the latest standards for that time period.   Furthermore, the tower was designed based upon your specifications, utilizing the most cost effective measures, as budget was an issue.
>
> . . .
>
> . . . . It is our opinion that the bracing is inadequate, and the cracked weld that you are seeing is a direct result from the lack of tower maintenance.  Plumb and tension on the tower should be performed on a yearly basis in order for the tower to perform efficiently.   In addition to the lack of maintenance, it was noted that the tower had to withstand severe wind and ice damage.   The combination of an out of plumb tower and severe ice loading can create a deflection in the structure.   This transition section would see more of an eccentric load under the above conditions before the rest of the structure; thus showing signs of failure prior to the remaining parts of the tower.
>
> . . .
>
> Central Tower is not opposed to helping with the cost associated with repairing the tower.   It is our offer to supply you with the necessary materials needed, and make recommendations of contractors to do the site work.[3]

---

[3] Significant to the allegations of fraud against Mr. Ryan, Mr. Ryan's April 2000 letter did not disclose any prior problems of weld cracking on other towers of similar design by Central Tower.   Furthermore, Mr. Ryan did not disclose his knowledge of poor flange to leg welds as exposed to him by two of his former employees.

After reading Mr. Ryan's letter, Mr. Hughes  thought that Central Tower was shifting the blame.  Mr. Larson does not recall receiving the letter from Mr. Ryan but does recall Mr. Ryan offering during a telephone conversation to supply GPCR with a bracing system.  Despite initially denying responsibility, two months later Mr. Ryan and Central Tower agreed to do warranty work on the Tower.  GPCR later accepted Central Tower's offer to design and fabricate a bracing system for the transaction section at no cost to GPCR.  There was no further contact between the parties until this suit.

In April or May 2004, Vincent O'Flaherty, an attorney, contacted GPCR regarding a problem Central Tower had with a collapsed tower in Kentucky.  Around June 2004, GPCR retained Lawrence Penner, an engineer, to inspect the Tower.  Based in part on this examination, GPCR alleges that the Tower was not constructed as it was designed and represented to GPCR.  It alleges that the Tower is defective because the absence of designed welds leaves the Tower over-stressed in a number of critical areas.

On November 15, 2004, GPCR filed suit against Central Tower and Mr. Ryan.  It subsequently amended its complaint on April 8, 2005.  GPCR contends that Mr. Ryan knew before 1992 that Central Tower had an issue with welds cracking prematurely and failed to disclose Central Tower's history of welding problems.  Rather than addressing or correcting the problems, it alleges that Mr. Ryan concealed these defects and continued to manufacture and sell defective towers.  It claims that Mr. Ryan did so even after two of his towers collapsed in 1993 and 2000 because of the same welding defects as alleged here.  To substantiate its

5

claim, it offers evidence that two of Mr. Ryan's former employees specifically told him that Central Tower's welds were faulty.   GPCR alleges that Mr. Ryan acted to conceal these defects so that he could sell Central Tower for a substantial profit in 2001.

On January 5, 2001, Central Tower sold its assets.   On October 22, 2001, Central Tower filed its Articles of Dissolution and proceeded to liquidate and dissolve.   On October 30, 2001, Central Tower, through its legal counsel, published its intent to dissolve in accordance with Indiana law, which GPCR has not disputed.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).   In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.   *Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002).   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."   *Wright ex rel. Trust Co. of Kansas v. Abbott Laboratories, Inc.,* 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."   *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party initially must show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.  *Spaulding,* 279 F.3d at 904 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986)).  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Adams v. American Guarantee & Liability Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir.2000) (citing *Adler,* 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)); *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324.  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.  *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir.2001).  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Mitchell v. City of Moore, Oklahoma,* 218 F.3d 1190, 1197-98 (10th Cir.2000) (quoting *Adler,* 144 F.3d at 671).  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibits incorporated therein." *Adams,* 233 F.3d at 1246.

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and in-expensive determination of every action." *Celotex,* 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on

speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." *Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

## ANALYSIS

For the reasons explained below, the court concludes that all of GPCR's claims against Central Tower are barred because Central Tower is a dissolved Indiana corporation and GPCR failed to bring its claims within the required time under Indiana law.  As to the fraud claim against Mr. Ryan, the court has identified two material issues advanced by the parties: (1) whether Mr. Ryan committed fraud; and (2) even if Mr. Ryan committed fraud, whether the two-year statute of limitations bars any fraud claim against Mr. Ryan.  The court concludes that GPCR's claim for fraudulent concealment is sufficient to withstand a motion for summary judgment.  Further, GPCR's fraud claim contains issues of material fact that prevent the court from invoking the two-year statute of limitation.

**1.**      **Claims Against Central Tower**

The parties agree that Central Tower was an Indiana corporation that dissolved in 2001. Whether a dissolved corporation has the capacity to be sued is determined by the law under which it was organized.  *See* F.R.C.P. 17(b); *United States v. Van Diviner*, 822 F.2d 960, 963 (10th Cir. 1987); *Brown v. Kleen Kut Manuf. Co.*, 714 P.2d 942, 945-46 (Kan. 1986).  Thus, because Central Tower was an Indiana corporation, Indiana law determines its capacity to be sued.

Indiana appellate courts have affirmed the common law rule that a dissolved corporation cannot be sued unless such action is authorized by a statute of its state of incorporation. *See Indiana Nat. Bank v. Churchman*, 564 N.E.2d 340, 342-43 (Ind. App. 1990) ( "It is '[a] firmly established premise that a dissolved corporation may thereafter be proceeded against either criminally or civilly only if authorized by the laws of the state of its incorporation.'") (quoting *United States v. P.F. Collier & Son Corp.*, 208 F.2d 936, 937 (7th Cir. 1954)).

Indiana does in fact have a "survival statute" that authorizes suit against a dissolved corporation. *See* I.C. § 23-1-45-7. This "operates to give life to a claim that would otherwise be extinguished by virtue of corporate dissolution." *Churchman*, 564 N.E.2d at 342-43. So long as a corporation gives proper notice of its dissolution, however, a corporation can be sued only within two years of its dissolution. *Id*. The parties agree that Central Tower is an Indiana corporation that dissolved in 2001 and that Central Tower gave proper notice of its dissolution. Further, the parties agree that under the established Indiana caselaw, any suit against Central Tower is barred unless it was filed on or before October 30, 2003. As a result, the outcome is clear: "Therefore suit is barred if filed, as here, over two years from the date of dissolution." *Id*.

Although GPCR concedes this as a matter of Indiana law, it contends that this court should invoke the doctrine of equity and allow suit against Central Tower in light of its alleged fraud against GPCR. Central Tower responds that the Indiana courts have already addressed this plea to equity, and they have soundly rejected it. This is correct. In *Lovold Co. v. Galyan's Brownsburg, Inc.*, 764 N. E. 2d 281, 286 (Ind. App. 2002), the court refused to

9

extend the time line for allowing suit regardless of the plaintiff's asserted "overriding public policies" in that case.   The court emphasized that the Indiana legislature consciously had determined that two years was the maximum time allowable to bring suit, and it recalled the following analysis from its decision in *Churchman*:

> Enactment of a survival statute indicates a legislative policy to place a definite termination upon corporate existence with respect to dissolution. . . . *The relief corridor afforded to claimants for a limited period thereafter is narrow indeed and should not be liberally extended or enlarged.* Courts interpreting such enactments give deference to this policy and have refused to apply equitable remedies to defeat survival statutes.

*Id*. at 285-86 (quoting *Churchman*, 564 N. E. 2d at 344).   Thus, there is no way around the absolute two-year limitation on bringing suit against a dissolved corporation under Indiana law, equity or otherwise.   As explained in *Lovald*, "It is apparent that [plaintiff] ignores that part of *Churchman* where we declared that the 'relief corridor' is narrow and will not be liberally extended or enlarged."  764 N.E.2d at 287.

The Tenth Circuit has an established hierarchy for this court to follow when applying another state's law.   Ultimately, this court must attempt to predict how the Indiana Supreme Court would decide this matter.  *Royal Maccabees Life Ins. Co. v. Choren,* 393 F.3d 1175, 1180 (10th Cir.2005).   The court must also "follow any intermediate state court decision unless other authority convinces [it] that the state supreme court would decide otherwise." *Save Palisade FruitLands v. Todd,* 279 F.3d 1204, 1207 n. 1 (10th Cir. 2002).   The court also should consider analogous decisions by the state supreme court, decisions of lower courts in the state, decisions of federal and other state courts, and the general weight and trend of

authority. *Progressive Cas. Ins. Co. v. Engemann,* 268 F.3d 985, 987-88 (10th Cir. 2001); *Yoder v. Honeywell Inc.,* 104 F.3d 1215, 1223 (10th Cir. 1997).  Dicta from the state supreme court represents the court's own comment on the development of state law and "is an appropriate source from which this prediction may be made." *Carl v. City of Overland Park,* 65 F.3d 866, 872 (10th Cir. 1995).

Instructively, the Indiana Court of Appeals has twice visited the issue of extending the time of the survival statute for suing a dissolved corporation, and both times it has refused to do so.  GPCR offers no reason why the Indiana Supreme Court would not reach the same conclusion.  There is simply no reason to reject the analysis of the Indiana appellate courts in giving deference to the Indiana legislature in setting this absolute limitation of two years in its survival statute.  Their decisions are well-reasoned and entirely consistent with the Indiana Supreme Court's analogous proclamation that equity cannot extend the time to file suit if a so-called "nonclaim statute" has been enacted by the legislature. *See Estate of Decker v. Farm Credit Services of Mid-America, ACA,* 684 N.E.2d 1137, 1139 (Ind. 1997) ("While equitable principles may extend the time for commencing an action under statutes of limitation, nonclaim statutes impose a condition precedent to the enforcement of a right of action and are not subject to equitable exceptions.").

With this trend in Indiana caselaw, the undersigned finds that under Indiana law all of the claims against Central Tower are barred by GPCR's failure to file suit within the time provided by the Indiana survival statute.  Because GPCR did not attack the validity of Central Tower's corporate dissolution, the validity of the notice given by Central Tower of its

dissolution, or the application of Indiana's two-year survival statute, GPCR's only argument is that this court should refuse to apply Indiana law.  The court rejects this argument as entirely unprincipled under Tenth Circuit precedent.  Accordingly, the court finds that all of GPCR's claims against Central Tower are barred.

### 2.     Claims Against Mr. Ryan

There is confusion regarding the exact allegation of fraud against Mr. Ryan.  Based on this ambiguity, Central Tower addressed both the allegation of traditional fraud (fraudulent misrepresentation) and the allegation of fraudulent concealment (fraud by silence).  The court certainly understands Central Tower's uncertainty over GPCR's claim against Mr. Ryan and will address both types of fraud potentially raised by GPCR.

### A.     Fraudulent Misrepresentation

Under Kansas law,[4] "fraud is never presumed and must be established by clear and convincing evidence."  *Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004).  The elements of fraud are as follows: (1) an true statement of fact; (2) known to be untrue by the party making it; (3) made with the intent to deceive or with reckless disregard for the truth; (4) upon which another party justifiably relies and acts to his or her detriment.  *Id.* at 1199.

In this case, the entirety of GPCR's response to the motion for summary judgment focuses on the tort of fraudulent concealment (fraud by silence), rather than fraudulent

---

[4] The court applies Kansas law because the parties have done so in their briefs, and the court concurs in their implicit conclusion based on well-established choice of law principles.

misrepresentation.    GPCR   makes   no   attempt   to   establish   the   elements   of   fraudulent

misrepresentation or to apply the facts of its case to those elements.   As a result, the court will

construe GPCR's fraud claim against Mr. Ryan as a claim for fraudulent concealment.

**B.    Fraudulent Concealment (Fraud by Silence)**

Under Kansas law, to prove fraud by silence, the plaintiff must set forth by clear and

convincing evidence:

> (1) that defendant had knowledge of material facts which plaintiff did not have
> and which plaintiff could not have discovered by the exercise of reasonable
> diligence; (2) that defendant was under an obligation to communicate the
> material facts to the plaintiff; (3) that defendant intentionally failed to
> communicate to plaintiff the material facts; (4) that plaintiff justifiably relied
> on defendant to communicate the material facts to plaintiff; and (5) that plaintiff
> sustained damages as a result of defendant's failure to communicate the material
> facts to the plaintiff.

*Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman,* 978 P.2d 922 (Kan. 1999)
(citations omitted).

**1.    Knowledge of Mr. Ryan**

Under the first element, there is an issue of material fact whether Mr. Ryan had

knowledge that Central Tower's allegedly defective welding caused the collapse of the Tower,

as well as one of its towers in Louisiana in 1993 and one of its towers in Kentucky in 2000.

Also, GPCR has cited the testimony of two former Central Tower employees who said that

they informed Mr. Ryan of these welding defects well in advance of these problems.   Not

surprisingly, Mr. Ryan disputes that he had such knowledge and alleges that GPCR easily could

have discovered these facts with due diligence, but these are issues of material fact for a jury

to decide.

13

### b.        Duty to Disclose

The parties vigorously dispute whether Mr. Ryan had a duty to fully disclose his knowledge concerning the collapse of the towers in Louisiana and Kentucky and his knowledge that his former employees informed him that Central Tower's welding was deficient.   In *Wolf v. Brungardt,* 524 P.2d 726 ( Kan. 1974), the Kansas Supreme Court explained this duty element:

> Where one party to a contract or transaction has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true state of facts to enable him to judge of the expedience of the bargain.  Key to this cause of action, we think, is the unequal relationship in which the claimant seeks particular information from a specialist upon which the recipient intends to rely or act. Under Kansas law, that interaction in those circumstances may create a fiduciary relationship. Moreover, although Kansas law does not specifically define the nature of that unequal relationship, we are satisfied its concept of a "fiduciary relationship" embraces it.

*Id.*

A necessary element of fraud by silence is that the defendant was under an obligation to communicate material facts to the plaintiff.   *DuShane v. Union Nat'l Bank,* 576 P.2d 674, 678-79 (Kan. 1978).   Whether a duty to disclose exists is determined by the facts and circumstances of each case.   *Ensminger v. Terminix Int'l Co.,* 102 F.3d  1571, 1574 (10th Cir. 1996).  "The question of what gives rise to a legal or equitable obligation to communicate is not always an easy question to resolve, but generally the duty must arise from a relationship existing between the parties when the suppression or concealment is alleged to have occurred."

*DuShane*, 576 P.2d at 674. Kansas courts have recognized that a duty to disclose may arise in two situations: (1) there is a disparity of bargaining power or of expertise between two contracting parties; or (2) the parties are in a fiduciary relationship to one another. *Id*. at 678-79.

In this case, GPCR does not claim that Mr. Ryan owed it a fiduciary duty. Instead, GPCR suggests that Mr. Ryan had a duty to disclose based on the disparity in knowledge between the parties. Accordingly, GPCR must demonstrate that Mr. Ryan had some special knowledge that resulted in a disparity of bargaining power or expertise. *DuShane,* 576 P.2d at 679. This may exist if the defendant "knows that the [plaintiff] is about to enter into the transaction under a mistake as to such facts, and that the other, because of the relationship between them, the customs in the trade, or other objective circumstances, would reasonably expect a disclosure of such facts." *OMI Holdings, Inc. v. Howell*, 918 P.2d 1274, 1300-01 (Kan. 1996) (internal quotation omitted).

Two other judges of this court, collecting and evaluating Kansas case law on this issue, have rejected the notion that the mere fact of superior knowledge arising from unequal access to information is sufficient, in and of itself, to create a duty of disclosure. *Meschke v. OrthAlliance, Inc.,* No. 01-1365-JTM, 2002 WL 1398635, at *2 (D. Kan. June 24, 2002); *see also Britvic Soft Drinks Ltd. v. ACSIS Techs., Inc.,* 265 F. Supp. 2d 1179, 1190-91 (D. Kan. 2003) (following *Meschke* and declining to find a duty to disclose based solely on superior knowledge). Rather, it is the fact of such superior knowledge combined with a relationship between the parties in the sense that there is, for example, a disparity of bargaining power or

15

expertise reflected in the relationship, that gives rise to a duty to disclose.  *Meschke,* at *2.
In *Meschke,* the court found that no such duty existed because the parties were experienced in
the business and were not fundamentally unequal in their bargaining or negotiating power.

The court finds those cases to be persuasive because of their reasoning and also because
they are consistent with other related authority on this issue.  For example, in *Ensminger v.
Terminix Int'l Co.,* 102 F.3d  1571 (10th Cir. 1996), the Tenth Circuit held that the defendant
termite inspection company had a duty of disclosure to prospective home buyers.  In so
holding, the Tenth Circuit noted that "[k]ey to this cause of action, we think, is the *unequal
relationship* in which the claimant seeks particular information from a specialist upon which
the recipient intends to rely or act."  *Id.* at 1574 (emphasis added).  This approach is also
consistent with the general rule stated in the Restatement (Second) of Torts that there is
generally no duty of disclosure between parties to a business transaction.  Restatement
(Second) of Torts § 551(1) & cmt. a (1977).  This lawsuit arises from such a general business
transaction and therefore the court is unpersuaded that Mr. Ryan necessarily had a duty of
disclosure solely because he had better access to any material information.

Nonetheless, the general rule that there is no duty of disclosure in a business
transaction is not without qualification.  In *Sparks v. Guaranty State Bank,* for instance, a
bank officer had represented to the holder of a returned check that the maker of the check was
solvent, which was false.  318 P.2d 1062, 1065 (Kan. 1958).  These misrepresentations caused
the plaintiff in that case to forbear the remedies of self-help and legal action against the maker
of the check.  The Kansas Supreme Court held that "one who responds to an inquiry is guilty

16

of fraud if he . . . gives . . . misleading answers . . . even though literally true as far as they go, or if he fails to disclose the whole truth." *Id.* at 1065 (quotation omitted). The court further explained:

> Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells, but also not to suppress or conceal and [sic] facts within his knowledge which will materially qualify those stated. If he speaks at all, he must make a full and fair disclosure.

*Id.* at 1066 (quotation omitted).

Thus, a defendant who speaks is under a duty not to mislead by disclosing only a portion of the truth. *Sparks* is consistent with the subsequently adopted approach of the Restatement (Second) of Torts (1977):

> One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
> . . .
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so. . . .

*Id.* § 551(2) & cmts. g, h.

In this case, it is Mr. Ryan's factual assertions in his April 2000 letter to GPCR that give rise to a duty to disclose on GPCR's fraud by silence claim. In that letter, he stated in part: "Your tower was designed by a structural engineer in 1992, meeting ANSI-222-E standards, the latest standards for that time period. Furthermore, the tower was designed based upon your specifications, utilizing the most cost effective measures, as budget was the issue."

17

Viewing the evidence in the light most favorable to GPCR, whether it was misleading for Mr. Ryan not to disclose all his knowledge of Central Tower's welding problems, then, presents a disputed issue of material fact. *See Eckholt v. Am. Bus. Information,* 873 F. Supp. 510, 520 (D. Kan. 1994) (observing that a dispute in a fraudulent concealment case over a party's duty to disclose based on its superior knowledge is an issue of fact). Mr. Ryan's claim that he is entitled to judgment as a matter of law because he owed GPCR absolutely no duty of disclosure is not correct. Mr. Ryan owed GPCR a duty of disclosure to the extent disclosure would prevent Mr. Ryan's affirmative representations from being misleading.

**c.      Intentional Failure to Disclose**

GPCR alleges that Mr. Ryan intentionally failed to disclose all his knowledge of Central Tower's welding problems because he wanted to suppress any negative information about Central Tower that might disrupt his sale of the company in 2001. Central Tower never disputes this allegation in its reply, and even it did, this is a fact question for a jury to decide.

**d.      Reliance**

Central Tower repeatedly insists that GPCR does not allege reliance on any statements by Mr. Ryan. The court disagrees. In several sections of its response to Mr. Ryan's summary judgment brief, GPCR alleges that it was misled and "lulled" into believing the Tower was properly constructed based on Mr. Ryan's affirmations in his April 2000 letter. To reiterate, in that letter, he stated in part: "Your tower was designed by a structural engineer in 1992, meeting ANSI-222-E standards, the latest standards for that time period. Furthermore, the tower was designed based upon your specifications, utilizing the most cost effective measures,

18

as budget was the issue." This excerpt of Mr. Ryan's contains numerous assertions of fact, as opposed to opinions, that GPCR might have relied upon to its detriment.    The court acknowledges that the entirety of Mr. Ryan's April 2000 letter was focused upon the transition section, which is limited to the top 100 feet of the Tower (from '855 to '955).   However, there is a material issue of fact whether this letter constitutes fraud by silence by not disclosing all of Mr. Ryan's knowledge concerning Central Tower's welding practices.   If in fact Mr. Ryan had knowledge of the tower collapses in Louisiana and Kentucky, and if his employees did in fact warn him long before that his towers were inadequately welded, then GPCR could establish fraud by silence based on Mr. Ryan's April 2000 letter.   Whether GPCR justifiably relied upon Mr. Ryan's April 2000 letter is a material issue of fact that a jury must decide.

**e.**      **Damages**

Central Tower never disputes that GPCR has properly supported its allegation that it has suffered recognizable damages.    Initially, Central Tower argued in its motion for summary judgment that GPCR's contract claim against Central Tower barred its claim for fraud damages against Mr. Ryan, but after GPCR's response brief, Central Tower abandoned this argument. Accordingly, the issue that GPCR has alleged a material issue of fact as to damages is undisputed.

**3.**      **Statute of Limitations**

The court begins its analysis by noting that it must be especially reluctant to grant summary judgment because of a statute of limitation.  *See Williams v. Borden*, Inc., 637 F.2d 731, 738 (10th Cir. 1980).  Indeed, when deciding a motion for summary judgment, the United

States Supreme Court has instructed that "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).    Accordingly, the court will examine the parties' arguments under this standard.

Applying Kansas law, this court applies the two-year statute of limitations for actions sounding in fraud pursuant to K.S.A 60-513(a)(3).  *See Sutton v. Sutton*, 118 P.3d 700, 702 (Kan. App. 2005).   A cause of action for fraud "shall not be deemed to have accrued until the fraud is discovered."  K.S.A. 60-513(a)(3).    Courts have interpreted this to mean that "the statute of limitations does not start to run until the plaintiff discovers the fraud, or until he learns such facts as would lead a reasonably prudent person to investigate." *Robinson v. Shah,* 936 P.2d 784, 794 (1997).   More importantly, when the evidence is disputed as to when substantial injury results or when it becomes reasonably ascertainable, this is an issue of fact. *Uhock v. Sleitweiler*, 778 P.2d 359, 361 (Kan. App. 1988). *See also Bick v. Peat Marwick and Main*, 799 P.2d 94, 99 ( Kan. App. 1990) ("Where there is evidence in dispute as to when the plaintiff's injury first became reasonably ascertainable, the question is one for the trier of fact.").

Mr. Ryan places enormous weight on the Kansas Supreme Court's decision in *Friends University v. W.R. Grace & Co.*, 608 P.2d 936 (1980).   In that case, a university brought an action for fraud against the manufacturing of roofing material used to roof the university's library.   The roof was completed in 1969 and beginning in 1970 the roof leaked every time it

20

rained.  The university, however, did not bring suit until 1977.  The Kansas Supreme Court later explained that in *Friends University* the negligent party was "immediately known and the injuries were ascertainable within a short period of time."  *Gilger v. Lee Const. Inc.*, 820 P.2d 390, 400 (1991).  Thus, *Friends University* does not stand for the proposition that in a case of building or design defect, a problem with one part of the structure should alert the plaintiff that every other part of the structure might be defective.  In that case, the plaintiff had pinpointed the exact problem with the structure, and the only issue to resolve was the extent of and liability for the damage.  Accordingly, the Kansas Supreme Court has largely limited the holding of that case, and it is not analogous to the facts of this case.

In this case, by contrast, there are two entirely discrete "injuries" alleged by GPCR based on defects with the Tower: (1) the transition section; and (2) the leg to flange welds.  GPCR clearly had notice as to the transition section in 1997 when Rhodes Tower Service inspected the cracked welds there, but it is a material issue of fact whether GPCR also had notice that the leg to flange welds in the Tower were defective until 2004.[5]   Indeed, the transition section of the Tower is separated from the section with the leg to flange welds by hundreds of feet, and simply because GPCR had notice that the Tower was defective in the

_____

[5] Perhaps Mr. Hughes' 1993 memo sufficiently reveals that GPCR believed every aspect of its relationship with Mr. Ryan and Central Tower was tainted by fraud.  The language of that letter, however, is phrased as rhetorical questions, not as conclusive statements of fact concerning the parties' relationship.  A jury could certainly find that GPCR had notice of fraud at that time, but this court cannot draw this conclusion as a matter of law.

transition section would not necessarily alert it to problems with the leg to flange welds.[6] Further, GPCR has cited evidence in the record that problems with the leg to flange welds were not visible to the naked eye during its annual inspections, which bolsters its claim that the issue of notice of both injuries is a disputed issue of fact.  All of these arguments are issues of fact.

The court's reluctance to invoke the running of the statute of limitations and bar the case as a matter of law is in accordance with Kansas law.   For instance, in *Ware v. Christenberry*, 637 P.2d 452 (Kan. App. 1981), the court refused to find that the statute of limitations ran in a building construction negligence case.    The court held that the issue must go to a jury to determine when the defect was reasonably ascertainable to the plaintiff.   *Id*. (citing *George v. W-G Fertilizer, Inc.*, 469 P.2d 459 (Kan. 1970)).

Other courts have reached the same result.  In *Armada de la Republica Argentina, (Argentina Government-Argentine Navy) v. Yorkington Ltd. Partnership*, 1995 WL 46394 (D.D.C. 1995), the plaintiff alleged that "although cracks and flooding were evident during the summer of 1988, the existence of these merely *cosmetic* injuries to the building does not serve to commence the limitations period for claims concerning damage to the *structural integrity* of the building." *Id*. at * 4.  Ultimately agreeing with this statement, the court began its analysis by observing the standard for summary judgment in this specific context:

---

[6]The court finds no inconsistency between this finding and its earlier finding that Mr. Ryan's April 2000 letter involves potentially fraudulent omissions regarding the entire Tower, not just the transition section.   The scope of any duty to disclose and the extent of notice provided by the April 2000 letter are both questions of a fact for a jury to decide.

> The United States Court of Appeals for the District of Columbia Circuit has noted that, "[a]s a general matter, what a plaintiff knew, and when she knew it, in the context of limitations defenses, are questions of fact for a jury," and that "summary judgment is not appropriate in a case applying the discovery rule if there is a genuine issue of material fact as to when, through the exercise of due diligence, the plaintiff knew or should have known of her injury." This language, coupled with the vigorous dispute between the parties as to both the timing and the significance of various factual discoveries, convince the court that defendants' summary judgment motions must be denied.

*Id.* at * 4 (quoting *Goldman v. Bequai,* 19 F.3d 666, 672 (D. C. Cir. 1994) (internal quotations omitted)).

Next, that court analyzed an analogous case where the court refused to invoke the statute of limitations in a dispute over when a construction defect was reasonably ascertainable:

> Applying the discovery rule, the court of appeals found that summary judgment was not appropriate because there was a legitimate factual dispute as to when the homeowner became aware of the faulty plumbing. The court noted that the limitations period might have begun to run when the pipes first froze, or four years later, when the homeowner received a report from a new contractor that the pipes were not adequately insulated, or at some point in between. It was for the trier of fact to make the ultimate determination.

*Id.* at *5 (discussing *Ehrenhaft v. Malcolm Price, Inc.,* 483 A.2d 1192 (D.C. App. 1984)).

In *Ehrenhaft,* the court advanced numerous public policy rationales for its reluctance to decide as a matter of law the timing of the discovery of a construction defect. Initially, the court explained that someone "who has arranged for the design and construction of a new room to his house, must undoubtedly rely upon the professional skills of those hired to perform the work. As a lay person, he is most likely without the requisite knowledge to determine whether the room has been properly designed or constructed. Moreover, it is unreasonable to expect

the client to engage yet another professional to oversee the work as it is performed."[7]   483 A.2d at 1202.   This analysis is entirely consistent with the parties in this case.   Repeatedly, GPCR argues that as an unsophisticated radio start-up, it had no ability to determine that the leg to flange welds were defective, particularly when these alleged defects were not even visible on its annual inspections done by hired professionals.

Additionally, the court in *Ehrenhaft* observed that "the difficulty in recognizing a deficiency in either design or construction is even more problematical when the deficiency is latent in nature." *Id*.   Drawing analogies to areas involving latent defects like  asbestos and pharmaceuticals, the court noted that a design or construction defect "may also not manifest itself until after the statute of limitations has run under traditional principles. Surely it is inconsistent with our notions of justice to interpret the 'accrual' of a cause of action to occur prior to a point in time at which a person would reasonably have knowledge of any wrongdoing."   *Id*. at 1202-03 (citing *City of Aurora v. Bechtel Corp.,* 599 F.2d 382, 387-88 (10th Cir.1979)).   Again, this analysis is relevant to the facts of this case.   It is certainly an issue of material fact whether GPCR, an entity arguably not equipped to detect intricate engineering defects, should be held responsible to identify an arguably latent defect such as the leg to flange weld in the Tower.

Finally, the court in *Ehrenhaft* emphasized "that the interests of judicial economy militate in favor of application of the discovery rule. In cases like the one at bar, where the

---

[7]    This analysis also strengthens the court's early finding that Mr. Ryan had a duty to disclose all of his knowledge of any welding defects by Central Tower.

professional returns upon request to remedy damages resulting from defective work, to preclude application of the rule would likely serve to encourage litigation in the first instance, rather than as a last resort." *Id*. at 1203. This rationale is also an appropriate consideration. If any defect in a building or design required a plaintiff to sue based on a defect to the entire structure, then the courts would be swamped with claims. Limiting the plaintiff to having notice of the specific injury known at the time is the more prudent course, for judicial economy and for the other reasons explained in *Ehrenhaft*.

Based on all of the foregoing reasons, the court finds that material issues of fact preclude the dismissal of this case under the statute of limitation. Summary judgment is inappropriate because the court cannot conclude as a matter of law when GPCR should have reasonably ascertained that it suffered an injury based on, most notably, alleged leg to flange welding defects.

**IT IS THEREFORE ORDERED BY THE COURT** that Central Tower and Mr. Ryan's motion for summary judgment (doc. # 41) is granted as to Central Tower and denied as to Mr. Ryan. All of GPCR's claims against Central Tower are precluded as a matter of law, but GPCR's fraud by silence claim against Mr. Ryan may proceed.

25

**IT IS SO ORDERED** this 8th  day of November, 2005.

s/ John W. Lungstrum

John W. Lungstrum

United States District Judge

26